IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Tina DeWalt,

      Plaintiff,

      v.                      Case No. 2:14-cv-64

Harrison County Commissioners,

      Defendant.


OPINION AND ORDER

This is an employment discrimination action filed pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and Ohio Rev. Code §4112.02(a) by Tina DeWalt, the plaintiff herein, against the Board of County Commissioners of Harrison County, Ohio. Plaintiff was formerly employed by defendant in the capacity of dog warden for Harrison County.  In January of 2013, plaintiff's position was abolished, and her employment was terminated.  Shortly after, two part-time dog warden positions were advertised. Plaintiff was encouraged by the commissioners to apply for both of these positions, but she was not hired for either position, and two males were hired.  Plaintiff now alleges that her treatment while employed and her termination were motivated by her gender in violation of Title VII and §4112.02.  She further alleges pursuant to §4112.02 that the termination of her employment was in retaliation for her complaints about gender discrimination.  This matter is now before the court on the defendant's motion for summary judgment.

I. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, by showing that the materials cited do not establish the absence or presence of a genuine dispute, or by demonstrating that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A) and (B).  In considering a motion for summary judgment, this court must draw all reasonable inferences and view all evidence in favor of the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Am. Express Travel Related Servs. Co. v. Kentucky, 641 F.3d 685, 688 (6th Cir. 2011).

The moving party has the burden of proving the absence of a genuine dispute and its entitlement to summary judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party's burden of showing the lack of a genuine dispute can be discharged by showing that the nonmoving party has failed to establish an essential element of his case, for which he bears the ultimate burden of proof at trial.  Id.  Once the moving party meets its initial burden, the nonmovant must set forth specific facts showing that there is a genuine dispute for trial.  Id. at 322 n. 3.  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  Niemi v. NHK Spring Co., Ltd., 543 F.3d 294, 298

(6th Cir. 2008).  A fact is "material" only when it might affect the outcome of the suit under the governing law.  Id; Anderson, 477 U.S. at 248.  The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts[.]" Matsuchita, 475 U.S. at 586.  A mere scintilla of evidence is not enough.  Anderson, 477 U.S. at 252; Ciminillo v. Streicher, 434 F.3d 461, 464 (6th Cir. 2006).

Because the Ohio Supreme Court has held that federal case law interpreting Title VII is generally applicable to alleged violations of §4112, see Ohio Civil Rights Comm'n v. David Richard Ingram, D.C., Inc., 69 Ohio St.3d 89, 630 N.E.2d 669, 672 (1994), this court will analyze plaintiff's state and federal claims solely under Title VII.  See Voltz v. Erie County, ___ F.App'x ___, 2015 WL 3701326 at *5 (6th Cir. June 16, 2015)(applying Title VII law to Ohio law claim of discrimination in termination and failure to rehire); Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 541 (6th Cir. 2003)(analyzing Ohio law retaliation claim under Title VII).

II. Disparate Treatment/Termination/Failure to Rehire Claims

A. History of the Case

The evidence reveals that plaintiff started working as a volunteer at the Harrison County Dog Pound in 2007.  DeWalt Dep., p. 17.  Prior to that time, plaintiff had a cosmetology license, had worked in restaurants, and had assisted in transporting rescued animals, but she had no prior training in animal control.  DeWalt Dep., pp. 11-12.  Carl Stewart, the warden at that time, was later replaced by Chris McMillan (also spelled McMillion in the record), a female.  When McMillan took leave in 2010 for personal reasons, then Commissioner Barbara Pincola approached plaintiff about being

a paid assistant. DeWalt Dep., pp. 17-18. McMillan was later terminated after having various disagreements with Pincola, and plaintiff was promoted to the full-time dog warden position on April 27, 2011. Affidavit of Commissioner Don Bethel, ¶ 3. Commissioners Pincola and William Host voted in favor of the promotion. Commissioner Bethel voted against plaintiff's promotion because of past issues concerning operations at the pound and his opinion that she would not do a good job as dog warden. Bethel Aff., ¶ 3. As an appointed employee of the county commissioner, plaintiff worked 34 regular hours per week in a salaried position which paid $500 per week. DeWalt Dep. pp. 94, 103, Bethel Aff., ¶ 4. However, she was on call 24/7 to respond to dog complaints. Plaintiff had one part-time assistant who worked 10-15 hours per week. DeWalt Dep., pp. 55, 95. During her tenure as warden, plaintiff had occasion to call the sheriff's office for assistance, but plaintiff did not have a cordial working relationship with Sheriff Myers and some of his deputies.

Beginning in August of 2011 and continuing through 2012, the commissioners began receiving numerous complaints from the community concerning plaintiff's rude demeanor toward the public and her occasional unresponsiveness to dog complaints. Plaintiff admitted that when faced with contentious members of the public, she didn't put up with it and responded in kind. DeWalt Dep., pp. 137-138. At one point, almost 600 e-mails were received during a short period of time.[1] Bethel Aff., ¶ 5. Bethel began documenting

---

[1] Plaintiff maintained that many of these e-mails were instigated by Margaret Cloud, a member of the Society for the Prevention of Cruelty to Animals ("SPCA") in Alaska, Robin McClellan, another purported SPCA member from Pennsylvania, and other persons outside the county. DeWalt Dep. pp. 62-64, 73-74.

matters concerning plaintiff's performance which came to his attention, including:

- reports that plaintiff was discourteous to citizens;

- a complaint from a pound volunteer regarding operations at the pound, stating that she would no longer be volunteering;

- plaintiff's scheduling of her assistant to work forty hours or more per week when the commissioners had only approved twenty hours per pay (two weeks);

- a report and official complaint by a family who stated that a dog they adopted from the pound which was described by plaintiff as being passive and good around children had bitten their child; unbeknownst to the family, the dog was pregnant; plaintiff refused to take the dog back without a surrender fee and blamed the dog bite on lack of parental supervision in a post on the pound's Facebook page; Harrison County Humane Officer Darla Smith also complained about plaintiff's handling of this situation;

- plaintiff's posting of a notice that the public could not leave unwanted dogs at the pound after being advised by the county prosecutor that the pound was required by law to have an after-hours drop-off box;

- a recommendation from the Harrison County prosecutor that the pound's Facebook page be shut down as it was not being used properly; the prosecutor notified the commissioners that he would not defend the commissioners in a law suit concerning material on the page;

- a citizen report that plaintiff delayed a week in picking up a hurt/sick dog found by a citizen; and

- a complaint from a citizen that a child was bitten twice by a vicious dog; plaintiff advised the child's father, who had managed to cage the dog, that she could not pick it up, and that the father should transport the dog to the pound.

Bethel Aff., ¶ 6; Doc. 21-2; Doc. 21-3, pp. 1-8; Doc. 21-5.

The record contains a letter from the Harrison County

5

Prosecutor concerning a report which was filed with the Harrison County Sheriff by Vincent Lunemann and his girlfriend, Toni Gilkerson, claiming that plaintiff had been harassing them for more than a month while investigating a complaint against them.  The letter advised the commissioners to review the professionalism rules in the Harrison County Dog Pound Guidelines with plaintiff. Doc. 21-4.

By letter dated December 11, 2011, from the Ohio Bureau of Criminal Investigation, the commissioners were advised that the Bureau had been asked to investigate allegations of possible criminal activities involving the dog pound, including a request from Harrison County Sheriff R.J. Myers for an investigation of possible financial irregularities involving pound funds.  Doc. 19-1, p. 12.  The letter reported inconsistencies in the weekly pay-in reports of money paid into the dog pound which plaintiff was required to file weekly with the commissioners, including inaccurate and missing reports.  Doc. 19-1, pp. 12-13.  In response, by memorandum dated January 3, 2012, the commissioners instituted the requirement that plaintiff make daily pay-ins.  The commissioners also received a management letter from State Auditor David Yost dated September 21, 2012, which noted that the procedures in place to control the collections at the pound were ineffective.  The errors found by the audit included the lack of reports for some weeks in 2011, the untimely deposit of collected funds, a lack of consistency between receipts in the county ledger and duplicate receipts, the failure to consistently follow the fee schedule for animal drop-off, a lack of accountability for donations received at the pound, and errors in the warden's

reports.  Doc. 19-1, p. 31.  Commissioner Bethel indicated that the constant complaints from the public, other county officials, and animal control organizations about plaintiff and the dog pound became a serious distraction to the Board, and occupied an unreasonable amount of the commissioners' time.  Bethel Aff., ¶ 10.

On January 2, 2013, the Board (now consisting of Commissioners Bethel, Host, and newly elected Dale Norris, who had replaced Commissioner Pincola) voted to abolish plaintiff's position and to create two new part-time dog warden positions.  According to Bethel, this was due to the numerous complaints received about plaintiff, which lead the commissioners to determine that the full-time position was too much for one person to handle.  Bethel Aff., ¶ 11.  Plaintiff was advised by letter dated January 2, 2013, that her position was being abolished, and that it would be replaced by two part-time positions "that we believe will better serve the public and relieve the over-bearing time commitment necessary to effectively do the job."  Plaintiff was invited to apply for the new positions.  Doc. 20, Ex. D.  The new part-time positions were advertised in the Harrison News-Herald on January 12, 2013.  Doc. 20, Ex. C.  One position paid $12.75 per hour, and the other position paid $12.50 per hour.  The commissioners did not conduct interviews, but reviewed and considered all 22 applications which they received, including plaintiff's application.  Norris Dep., p. 17.

Prior to the abolishment of plaintiff's position, Bethel approached John Birney and Jeff Campbell to determine if they would be interested in applying for the new part-time positions.  Bethel Dep., pp. 20-21.  Birney had recently retired from his position as

manager of Tappan Lake Park.  He had previously worked as a deputy sheriff and was certified in 1991 through the Ohio Police Officer Training Academy ("OPOTA") to carry a firearm.  Birney Dep., p. 7. Campbell was retired from his position as assistant water superintendent for Cadiz.  He also had been a deputy sheriff since 1992 and was certified to carry a weapon.  Campbell Dep., pp. 6-7. Birney and Campbell were ultimately appointed by the commissioners to fill the two part-time positions.  Birney works 20-22 hours per week, and Campbell works 20-21 hours per week.  Birney Dep., p. 6; Campbell Dep., p. 13.  Since they were hired, the commissioners have had no complaints concerning the professionalism or performance of the dog wardens or the operation of the pound. Bethel Aff., ¶ 16.  Susan Fleming was hired as an assistant at the pound to perform jobs such as cleaning and answering the phones. When she left for a higher paying job, Dave Ward was hired as the assistant.  Campbell Dep., pp. 14-15.

B. Standards

The framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to plaintiff's discrimination claims. In the absence of direct evidence of discrimination (there is none in this case), the plaintiff must make a prima facie case by showing: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.  Serrano v. Cintas Corp., 699 F.3d 884, 892-93 (6th Cir. 2012); Vincent v. Brewer Co., 514 F.3d 489, 494 (6th Cir. 2007)(setting forth elements in gender discrimination case).  To be

"similarly situated," the other employees must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the defendant's treatment of them for it. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992); see also Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)(plaintiff must show that her situation was comparable to that of the other employees in all factors relevant to the factual context).

Once plaintiff establishes a prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the adverse employment action. Serrano, 699 F.3d at 893. If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was a pretext for discrimination. Serrano, 699 F.3d at 893. Pretext is shown by evidence that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the challenged conduct. McCarthy v. Ameritech Publishing, Inc., 763 F.3d 469, 482 (6th Cir. 2014).

The discrimination laws "do not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." Hartsel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996). "Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons." Id. An employer's preference for one candidate for a position over another is not actionable unless it was motivated by discriminatory animus.

9

Geiger v. Tower Automotive, 579 F.3d 614, 625 (6th Cir. 2009); see also Browning v. Dep't of Army, 436 F.3d 692, 696-97 (6th Cir. 2006)("[T]he employer's motivation, not the applicant's perceptions, or even an objective assessment [] of what qualifications are required for a particular position, is key to the discrimination inquiry." (internal quotation marks omitted)).

C. Disparate Treatment

Plaintiff testified in her deposition concerning various alleged instances of disparate treatment. She first noted that the county garage, under the management of Dale Norris (before he was elected as a commissioner), refused to service the dog pound truck when Chris McMillan became warden, thus requiring them to take the truck elsewhere to be repaired. DeWalt Dep., pp. 96-97. Plaintiff claims that this stemmed from an instance in 2008 or 2009 when Norris took two dogs to the pound and was told by McMillan and plaintiff that he could not leave the dogs, as they did not perform euthanasia, and to take them to a veterinarian. DeWalt Dep., p. 35. Norris claimed that he did not bring the dogs to the pound to be put down; rather, he was under the impression that there was a local man who had agreed to take all hounds left at the pound. He also stated that McMillan and plaintiff were rude to him. Norris Dep., pp. 15-17. However, there is nothing about this evidence which suggests that Norris acted with a discriminatory animus in refusing to service the dog pound truck. See Bryant v. Martinez, 46 F.App'x 293, 297 (6th Cir. 2002)(treatment motivated by personal dislike is not actionable under the discrimination laws)(citing St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)). In addition, Norris was not a commissioner at this time, and plaintiff stated

10

she had no evidence that the commissioners told Norris not to work on the dog pound truck; in fact, the commissioners stated that they couldn't understand why the garage would not work on the truck. DeWalt Dep., pp. 96-98.  This evidence does not establish an adverse job action ordered by the commissioners.

Plaintiff also contended that the sheriff's office would not send anyone when she called for a backup.  DeWalt Dep., p. 99. Plaintiff testified that she called the sheriff's office for backup a couple of times and was told that it wasn't their job.  DeWalt Dep., p. 66.  However, she also testified regarding another instance where the sheriff's office did dispatch a cruiser.  DeWalt Dep., p. 76.  Plaintiff had no evidence that the sheriff was directed in his actions by the commissioners.  DeWalt Dep., p. 99. In fact, Bethel testified that when plaintiff complained about the sheriff not responding, he followed up and reviewed two tapes of plaintiff requesting help.  He noted that the tapes revealed that a cruiser was on the way and just didn't arrive fast enough to suit plaintiff.  Bethel Dep., pp. 12-14.  The sheriff was not plaintiff's employer, and there was no evidence that the commissioners had any jurisdiction to tell the sheriff how to run his department.  This evidence fails to reveal that plaintiff suffered an adverse job action due to any acts on the part of the commissioners.

The same can be said about plaintiff's complaints concerning other acts of the sheriff and his deputies, including the sheriff's removal of the radio from the unlocked pound vehicle on one occasion to demonstrate to plaintiff that the truck should be kept locked (plaintiff claimed that it could not be locked), and moving

11

the vehicle on another occasion to the lot behind the sheriff's office.  However, plaintiff stated that she did not believe that the sheriff was following the instructions of the commissioners in performing these acts.  DeWalt Dep., pp. 77-78.  In addition, there is no evidence that the sheriff's acts were motivated by plaintiff's gender.  Plaintiff testified that the sheriff got along fine with Chris McMillan, the previous female warden.  DeWalt Dep., p. 72.  Commissioner Pincola testified in her deposition that Sheriff Myers never expressed his discontent with plaintiff in sexual terms.  Pincola Dep. 33-34.  According to plaintiff, Pincola told her that the sheriff was treating her poorly because he didn't like her, and that plaintiff was not being treated differently because she was a woman, but rather because she was not a member of the "good ol' boys' club."  DeWalt Dep., pp. 115-116.  There is other evidence that Sheriff Myers' attitude toward plaintiff was due to his personal dislike of plaintiff stemming from her job performance.  See Barness v. Dep't of Veterans Affairs, 153 F.3d 338, 342-43 (6th Cir. 1998)(finding supervisor's conduct making plaintiff the butt of office jokes was consistent with personal dislike rather than discriminatory animus).  For example, Sheriff Myers complained to Commissioner Bethel about plaintiff being rude to his deputies and dispatchers.  Bethel Dep., p. 10.  He also commented to Host that plaintiff had to continually request help because she was afraid of dogs.  Host Dep., pp. 10-11.  The evidence suggests that the sheriff had cause for concern that the manner in which plaintiff performed her job placed extra demands on his department.

Plaintiff also alleged that she was treated differently than

12

Carl Stewart, the previous male dog warden.  She noted that Stewart spent half his working day over in the sheriff's office, whereas she spent her day performing her job.  The pound operational guidelines require the warden to respond to after-hour calls, but plaintiff claimed that Stewart refused to go out. DeWalt Dep., pp. 102-06.  Apparently, this was because Stewart was paid as an hourly employee, not a salaried employee.  DeWalt Dep., p. 103.  It is not clear why the commissioners' expectation that plaintiff would competently perform her job constituted discrimination just because a prior dog warden had failed to perform his job satisfactorily. The evidence indicates that Stewart was not similarly situated in all relevant aspects.  The commissioners tried to terminate Stewart's employment, but discovered that he had almost one thousand hours in compensatory time which they could not afford to pay in cash.  They were forced to give him a year of working half days, while hiring Chris McMillan as an assistant.  Pincola Dep., p. 14.  At the end of the year, Stewart was going to be terminated, but he resigned before that happened.  DeWalt Dep., p. 100.  As a result of the problems they had with Stewart, the commissioners appointed plaintiff as a salaried employee.  DeWalt Dep., p. 103. This evidence fails to establish a prima facie case of disparate treatment.

Plaintiff also complained about the fact that she was not permitted to openly carry a firearm with her uniform.  The commissioners said that she could only do that if she went through OPOTA training.  The sheriff's office refused to send her for training.  DeWalt Dep., p. 82.  Commissioner Bethel testified that he felt that it was not his place to demand that the sheriff put

13

plaintiff through training.  Bethel Dep., p. 19.  Plaintiff has
cited no Ohio statute indicating that the Board has any authority
over the manner in which the county sheriff operates his
department.  Plaintiff testified that Stewart, the former male
warden, carried a gun and went to training.  However, she did not
know how Stewart became certified to carry a firearm, and had no
evidence that the commissioners provided him with training.  DeWalt
Dep., pp. 83-84.  Plaintiff also noted that Birney and Campbell,
the two part-time male wardens, were certified to carry firearms.
However, they were certified prior to becoming wardens because they
were commissioned years before as deputy sheriffs.  Plaintiff has
produced no evidence that any of the male dog wardens received more
favorable treatment from the commissioners with regard to firearm
certification.

Plaintiff further testified that when she requested that the
commissioners pay half of her personal cell phone bill due to the
fact that she took after-hours calls from the sheriff's office on
that phone, this request was refused.  DeWalt Dep., pp. 131-132.
The current male wardens have a cell phone for their use which they
leave at the office at night.  Campbell Dep., p. 19.  However, this
phone was an extra phone which is owned and paid for by the
Harrison County Engineer.  This phone was not discovered until
after the new wardens were hired.  The commissioners do not pay the
bill for this phone or control its use.  Bethel Aff., ¶ 14.  The
commissioners have never paid for phones for the dog wardens or
reimbursed them for the use of their own phones.  The auditor
refused to pay the bill for plaintiff's phone because no one else
employed by the County had their cell phones paid for by the

county.  The auditor also informed plaintiff that if the county paid her bills, they would become public records, and plaintiff stated that she did not want this to happen.  On one occasion, Bethel gave plaintiff a phone card he paid for himself, but he was instructed by Commissioner Barbara Pincola that this was inappropriate and not to do this.  Bethel Aff., ¶ 13.  Plaintiff has not established a claim of disparate treatment in regard to the payment of her cell phone bill.

Plaintiff also complained about the condition of the dog pound truck.  When the part-time wardens started, they used the same truck plaintiff had used.  Months later, the repair bills on the truck became so large that they approached the commissioners about getting a new vehicle, and one was approved.  Morris Dep, p. 24; Campbell Dep., p. 17.  Commissioner Bethel explained in his affidavit that during the time plaintiff was the dog warden, Harrison County was cash-strapped.  Since 2012-2013, the county has experienced a tremendous increase in revenue based on the natural gas boom in Eastern Ohio.  Therefore, the county now has the resources to better equip its employees in the various county agencies, including the dog wardens and the dog pound.  Bethel Aff., ¶ 15.  Plaintiff has produced no evidence that male dog wardens who occupied the position under economic circumstances similar to those in existence during plaintiff's tenure were treated more favorably in terms of being provided equipment or other resources.

Plaintiff has failed to show the existence of a genuine dispute of fact which would preclude granting summary judgment to defendant on her disparate treatment claims.

15

D. Termination

Defendant does not argue that plaintiff has failed to show a prima facie case in regard to her termination.  Rather, defendant argues that there were legitimate, nondiscriminatory reasons for the abolishment of the full-time warden position and the failure to hire plaintiff for either of the part-time warden positions.  In plaintiff's termination letter, the commissioners stated that the creation of two part-time positions would "better serve the public and relieve the over-bearing time commitment necessary to effectively do the job."  Doc. 20, Ex. D.  At the open session meeting where the abolishment of the full-time position was discussed, Bethel said that the change was based on plaintiff's performance and conduct.  Norris Dep., p. 12.  Other reasons given were to save the county money, to show better performance, and to create part-time positions which would be less stressful.  Norris Dep., p. 13.

In a newspaper article concerning the commissioners' meeting where the hiring of Birney and Campbell was announced, Bethel was quoted as saying, "We changed the dog warden's position from full-time to two part-time positions to take off a little bit of the stress and better serve the public[.]"  Doc. 32, Ex. B.  When confronted at the meeting by Beth Roski, a dog pound volunteer, regarding why there was no meeting with plaintiff "to discuss the things you people had a problem with[,]" Bethel responded that the commissioners had met with plaintiff in the past, but "the move was simply to improve service," and "there were other issues he did not deem appropriate to discuss in public."  Doc. 32, Ex. B.  In regard to the selection of new wardens, the news article reported Bethel

16

as saying that the applicants were required to have a firearms certification because officials were considering the implementation of tranquilizer guns, and they had to be familiar with crisis management. Bethel further indicated that they wanted someone who worked well with the sheriff's office, which received dog calls when the pound was closed. Doc. 32, Ex. B.

Commissioner Host later stated in his deposition that when the commissioners discussed abolishing plaintiff's position in December, they discussed the budgetary implications of that decision as well as plaintiff's personal conflicts with the public. Host Dep., p. 6. In his affidavit, Commissioner Bethel stated that the Board decided to create the two new part-time positions when it determined "that the full time position was apparently too much for one person to handle." Bethel Aff., ¶ 11. Bethel stated that Birney and Campbell were hired because of their experience and ability in dealing with the public in a professional manner, their law enforcement background and their history of public service. Bethel Aff., ¶ 16. Commissioner Norris stated in his deposition that the commissioners were looking for candidates who could deal with the public and handle the crisis management aspect of the dog warden's job. Norris Dep., p. 21. He felt that Birney and Campbell were the best-qualified candidates. Norris Dep., p. 22.

Plaintiff alleges that defendant cannot now rely on her performance deficiencies as a reason for the abolishment of her position or the failure to re-hire her because they were not announced at the time the commissioners' decision. The Sixth Circuit has held that shifting justifications over time or an employer's changing rationale for making an adverse employment

17

decision can be evidence of pretext. Cicero v. Borg-Warner Automotive, Inc., 280 F.3d 579, 592 (6th Cir. 2002). However, to show pretext, plaintiff must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. Fane v. Locke Reynolds, LLP, 480 F.3d 534, 541 (7th Cir. 2007)(citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)).

Pretext cannot be inferred where the explanations given for plaintiff's termination were not inconsistent, but were in fact separate and independent reasons. Nasti v. CIBA Specialty Chemicals Corp., 492 F.3d 589, 594 (5th Cir. 2007). Pretext is not shown where the employer could have relied on all of the reasons given simultaneously, regardless of whether it emphasized one over the others at a given time. Fane, 480 F.3d at 541. Reasons are not "shifting" where they are not incompatible. Nidds v. Schindler Elevator Corp., 113 F.3d 912, 918 (9th Cir. 1996). Likewise, providing additional non-discriminatory reasons that do not conflict with the reasons stated at the time of discharge does not constitute shifting justifications. MacDonald-Bass v. J.E. Johnson Contracting, Inc., 493 F.App'x 718, 726 (6th Cir. 2012)(noting that the initial reason for termination remained the same, albeit expanded through the litigation); see also Johnson v. Nordstrom, Inc., 260 F.3d 727, 733 (7th Cir. 2001)(pretext not shown where employer simply supplemented its explanations in the context of EEOC charges and litigation, and did not retract any of its reasons for failing to promote the plaintiff); Tidwell v. Carter Products,

18

135 F.3d 1422, 1428 (11th Cir. 1998)(existence of a possible additional non-discriminatory basis for plaintiff's termination does not prove pretext). An employer's reasons for an employment decision are not "shifting" where various members of management cite different areas of deficiency that they deem important. Peters v. Lincoln Electric Co., 285 F.3d 456, 474 (6th Cir. 2002).

Consideration of plaintiff's performance deficiencies easily falls within the scope of the need expressed in plaintiff's termination letter to take action to "better serve the public and relieve the over-bearing time commitment necessary to effectively do the job." The fact that plaintiff's performance was not specifically referred to in plaintiff's termination letter does not mean that it was not considered or relied on at the time by the commissioners. Bethel's comments quoted in the newspaper article indicate that plaintiff's performance difficulties were considered by the commissioners, but that he did not think it was appropriate to discuss those matters in public. Plaintiff can't complain about the fact that the commissioners exercised restraint and did not publicly discuss the performance issues which had come to their attention at the public meeting.

The evidence also indicates that the full-time position, which included handling after-hours calls, was stressful, and that the commissioners' aim in addressing this problem was not pretextual. Plaintiff herself acknowledged that she had a hard time getting back to the office to do the daily paperwork. DeWalt Dep., p. 52. The goal of reducing expense to the county is also encompassed within the need to better serve the public. The evidence shows that the need to improve performance and to save the county money

19

were considered at the outset.  Likewise, the need to fill the position with someone familiar with crisis management, who would not escalate a volatile situation, and who would work well with the sheriff's office are all considerations which do not conflict with the need to better serve the public.  No inconsistent reasons have been shown in this case.

Plaintiff also argues that pretext has been shown because the hiring of two part-time wardens did not save the county money.  If both part-time wardens work 20 to 22 hours per week, at $12.75 and $12.50 per hour respectively, this results in a combined wage of $505 to $555.50 per week.  Plaintiff was making $500 per week, but was only working 34 regular hours, yielding an approximate hourly rate of $14.70 per hour.  If she worked forty hours at that rate, her weekly salary would be $588.00.  Defendant also notes that plaintiff, as a full-time salaried employee, was entitled to other benefits, such as insurance and overtime compensation if she worked more than forty hours.  The two part-time wardens are not paid overtime, see Campbell Dep., p. 13, and are not entitled to insurance coverage.  The fact that some new equipment has been provided to the pound since the change to part-time positions has been explained by the gas boom in Eastern Ohio, which increased revenue to Harrison County since the change.  Bethel Aff., ¶ 15. Thus, the fact that new equipment has since ben provided to the pound is insufficient to support plaintiff's challenge to the commissioners' stated goal of saving the county money.

Plaintiff also notes as evidence of pretext the fact that Bethel contacted Birney and Campbell prior to the abolishment of plaintiff's position to determine if they would be interested in

part-time positions.  This is insufficient to establish that the reasons given for abolishing the full-time position and for failing to hire plaintiff for one of the new part-time positions were pretexts for discrimination based on gender.  Bethel encouraged Birney and Campbell to apply for the positions because he believed that they possessed the right experience and personalities to perform the job efficiently and professionally, and that they would help mend the rift with the public and within county government caused by plaintiff.  Bethel Aff., ¶17.  However, plaintiff was also encouraged by the commissioners to apply for the part-time positions.  The commissioners did not decide in advance to hire Birney and Campbell.  Rather, the commissioners as a board reviewed all of the applications, including plaintiff's application, and made their choice based on the merits of the applicants.  Bethel Aff., ¶ 17.  According to Norris, the commissioners reviewed all 22 applications, narrowed them down to five applicants, and then decided on Birney and Campbell.  Norris Dep., pp. 17, 20.  He felt that Birney and Campbell were the best qualified.  Norris Dep., p. 22.

Finally, plaintiff argues that there was a general culture of animosity towards her based on her gender which indicates that the reasons provided by the defendant are a pretext for discrimination. Although plaintiff was the target of animosity from other county officers and employees, as well as from members of the public, there is no evidence that the cause of this dissension was plaintiff's gender.  Many of the county employees who disliked plaintiff were women, including the clerk, Brandi Burton, another county employee named Shirley, and Darla Smith, the county humane

officer.  Pincola Dep., pp. 37, 41, 62.  Pincola described a "hate group" against plaintiff made up of six women.  Pincola Dep., p. 62.  She also stated that the failure of the sheriff, Brandi and Shirley to support plaintiff was because they didn't like her, a "personality conflict."  Pincola Dep., p. 63.  As discussed above, plaintiff had problems with Sheriff Myers and some of his deputies, but Myers had no problem with Chris McMillan, the previous female dog warden.  In any event, the sheriff was not plaintiff's employer, and Commissioner Bethel made efforts to smooth out the problems between them.

The evidence shows that plaintiff had both supporters, such as Commissioner Pincola, and detractors.  This does not establish that the commissioners did not want plaintiff occupying the position of dog warden because of her gender.  Pincola, who was a commissioner until the day before the decision to abolish the full-time dog warden position was made, stated that she had no information that the decision to abolish plaintiff's position was due to her gender.  Pincola Dep., p. 58. The commissioners had reason to be concerned about plaintiff's job performance, and they offered legitimate, nondiscriminatory reasons for selecting two male candidates whom they thought were better qualified for the part-time positions.

The court concludes that defendant has offered legitimate, non-discriminatory reasons for the abolishment of plaintiff's full-time warden position and for the failure to hire her for one of the part-time positions.  The arguments plaintiff advances in support of pretext are insufficient to raise a genuine dispute of fact on that issue.  Defendant is entitled to summary judgment on

plaintiff's termination and failure to re-hire claim.

III. Retaliation Claim

To establish a prima facie case of unlawful retaliation, plaintiff must demonstrate by a preponderance of the evidence that: (1) she engaged in activity protected by Title VII; (2) the defendant knew that she engaged in this protected activity; (3) the defendant subsequently took an employment action materially adverse to the plaintiff; and (4) a causal connection between the protected activity and the materially adverse employment action exists. Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014). If plaintiff proves a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. Abbott v. Crown Motor Co., Inc., 348 F.3d 537, 542 (6th Cir. 2003). If the defendant meets this burden, plaintiff must demonstrate by a preponderance of the evidence was a mere pretext for discrimination. Id.

"Title VII retaliation claims 'must be proved according to traditional principles of but-for causation[.]" Laster, 746 F.3d at 731 (quoting Univ. of Tex. Southwest Med. Ctr. v. Nassar, ___ U.S. ___, 133 S.Ct. 2517, 2533 (2013)); see also Abbott, 348 F.3d at 543 (to establish a causal connection, plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action had the plaintiff not engaged in activity that Title VII protects).

Title VII "protects not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment

practices." <u>Laster</u>, 746 F.3d at 730 (holding that harassment complaints filed internally with human resources were protected activities under Title VII).

In regard to the first element, plaintiff testified generally that she made allegations of sex discrimination by the sheriff to then Commissioner Pincola.  These conversations occurred when the radio was removed from the dog warden truck by Sheriff Myers. DeWalt Dep., pp. 113-14.  Plaintiff testified at one point that she and Pincola both agreed that "it was going on." However, plaintiff did not state specifically what acts they discussed which constituted discrimination.  DeWalt Dep., 116.  Pincola testified that after plaintiff complained about her treatment by the sheriff, they "probably discussed" that she was being treated differently by the sheriff because she was female.  When Pincola discussed plaintiff's complaints about the sheriff's treatment of her with Bethel, he responded that he just wanted a dog warden who was competent and didn't care what the warden's sex was.  Pincola Dep., pp. 49-50.  Bethel stated that when plaintiff complained to him about the way she was being treated by the sheriff, he followed up on her complaint by talking with the sheriff.  Bethel Dep., p. 11.

Even assuming that this vague testimony is sufficient to show that plaintiff engaged in protected activity by talking with Pincola, plaintiff must also show that the board was aware of her protected activity.  Although there is evidence that Bethel was aware of plaintiff's complaints to Pincola, there is no evidence that Host and Norris, the other two commissioners who voted with Bethel to abolish the full-time position, were aware of plaintiff's conversations with Pincola.

24

Plaintiff must also produce evidence that there was a causal connection between her protected activity and the adverse job action.  Because the actions abolishing the full-time position and appointing Birney and Campbell as part-time wardens only required two out of three affirmative votes, plaintiff had to produce evidence that at least two of the commissioners were aware of her alleged protected activity in order to prove the element of causation.  Because there is no evidence that Host and Norris knew about plaintiff's conversations with Pincola, it cannot be said that their affirmative votes, which were legally sufficient to abolish the full-time position and to hire the two part-time dog wardens, were the result of a retaliatory motive.  There is no other evidence that plaintiff's conversations with Pincola had any causal connection with the subsequent abolition of her position. It is unclear when these conversations occurred during the approximately one year and eight months that plaintiff served as full-time dog warden.  Therefore, it is not possible to draw any inference of causation from the temporal proximity of these statements to the abolition of the full-time warden position. Plaintiff testified in her deposition that she had no information which would show that her conversation with Pincola had anything to do with the abolishment of her position.  DeWalt Dep., p. 117.

The evidence fails to show that plaintiff could establish a prima facie case of retaliation, but even assuming that she could, the same legitimate, nondiscriminatory reasons discussed above in connection with her termination claim would apply here as well. Plaintiff has not produced evidence that those reasons were a pretext for a retaliatory motive based on her alleged protected

activity.  Plaintiff has failed to produce evidence showing that her position would not have been abolished, and that her application for a part-time position would not have been denied, but for her alleged protected activity.  Plaintiff has failed to demonstrate the existence of a genuine dispute of fact regarding her retaliation claim, and defendant is entitled to summary judgment on that claim.

<u>IV. Conclusion</u>

In accordance with the foregoing, defendant's motion for summary judgment (Doc. 21) is granted.  The clerk shall enter judgment in favor of the defendant on plaintiff's claims.


Date: September 28, 2015           s/James L. Graham
                          James L. Graham
                          United States District Judge